AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

**ORIGINAL**

| UNITED STATES OF AMERICA | DOCKET NO. |
|---|---|
| v. | |
| RODRIGO FRANCO | MAGISTRATE'S CASE NO. **17 MJ01832** |

Complaint for violation of Title 18, United States Code, Sections 545, 2(b) (unlawfully importing, and willfully causing the unlawful importation of, merchandise into the United States contrary to law)

| NAME OF MAGISTRATE JUDGE | | LOCATION |
|---|---|---|
| HONORABLE JOHN E. MCDERMOTT | UNITED STATES MAGISTRATE JUDGE | Los Angeles, California |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| March 2, 2017 | Los Angeles County | 1551 Ridge Crest Street, Apartment G, Monterey Park, CA |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. §§ 545, 2(b)]

On or about March 2, 2017, in the County of Los Angeles, within the Central District of California, and elsewhere, defendant RODRIGO FRANCO knowingly and fraudulently, imported and brought, and caused to be imported and brought, merchandise, namely three King Cobras (*Ophiophagus hannah*), into the United States contrary to law, that is: (1) without reporting or declaring said King Cobras to the United States Fish and Wildlife Service, in violation of Title 50, Code of Federal Regulations, Section 14.61; and (2) without obtaining the necessary documents under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), in violation of the Endangered Species Act, Title 16, United States Code, Sections 1538(c) and 1540(b), and CITES, Title 50, Code of Federal Regulations, Sections 23.13(a) and 23.20(e).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **ADAM DIEHL** |
|---|---|
| | OFFICIAL TITLE SA, U.S. Fish and Wildlife Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | | DATE July 21, 2017 |
|---|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Erik Silber x12231 REC: bond

## AFFIDAVIT

I, Adam Diehl, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of the Interior, United States Fish and Wildlife Service ("USFWS"), Office of Law Enforcement ("OLE"), stationed in Torrance, California.  I am authorized by the Secretary of the Interior to conduct searches and seizures and to make arrests, as authorized by law, pursuant to the Lacey Act, Title 16, United States Code, Section 3371 et seq.  I am an investigative law enforcement officer of the United States within meaning of Title 16, United States Code, Section 3375, and a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.  I have been so employed since May of 2016.

2.    I was previously employed as a Special Agent with the Department of Justice, Drug Enforcement Administration ("DEA") in Los Angeles, California for approximately two years, and a Law Enforcement Officer with the United States Forest Service, Law Enforcement and Investigations in Southern California for approximately six years.  I received a Bachelor's degree in Social and Criminal Justice from Ashford University in July of 2013.  I am also a graduate of the Fullerton College Police

Academy in Fullerton, California, the Land Management Police Training Program at the Federal Law Enforcement Training Center in Glycol, Georgia, the DEA Basic Special Agent Academy in Quantico, Virginia, and the USFWS Special Agent Basic School ("SABS") at the Federal Law Enforcement Training Center in Glycol, Georgia.

3.    During the last nine years, I have conducted several complex investigations involving the protection of natural resources and United States government property, arson, firearms violations, narcotics trafficking, money laundering, and fish and wildlife violations.  Since my employment with the USFWS in 2016, I have conducted, or been involved in, multiple investigations relating to the illegal commercialization of protected fish and wildlife, and violations of federal fish and wildlife laws.  I have read, studied, and received training on the laws enforced by the USFWS.  I have also received advanced training in numerous aspects of criminal investigative techniques, including electronic surveillance and the application of undercover techniques for criminal investigations.

## II. PURPOSE OF THIS AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint against and arrest warrant for RODRIGO FRANCO for a violation of Title 18, United States Code, Section 545 (importing merchandise into the United States contrary to law).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. APPLICABLE LAW

6.    The Endangered Species Act is a federal law that, among other things, regulates the importation and exportation of certain wildlife and plants to and from the United States, and implements the United States' obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

7.    CITES is an international treaty among approximately 183 nations, including the United States and China, that

3

establishes certain requirements that must be met before CITES-protected wildlife may be imported or exported from signatory nations. Wildlife protected under CITES is divided into Appendices I, II, and III. Wildlife listed in Appendix I have the highest level of protection and include those species threatened with the immediate risk of extinction. Wildlife listed in Appendix II are considered at risk for becoming endangered and require permits for import and export to and from the United States.

8. Title 50, Code of Federal Regulations, Section 23.13 generally provides that it is unlawful for any person subject to the jurisdiction of the United States to attempt to import, export, re-export, or engage in international trade with, any specimen of a species listed in CITES Appendix I, II, and III. All CITES Appendix II wildlife may only be imported into the United States when accompanied by a foreign CITES export permit or re-export permit from the Management Authority of the country from which the wildlife is being exported, and may only be exported from the United States when accompanied by a CITES export permit or re-export permit issued by the United States. 50 C.F.R. §§ 23.20(e), 23.35 and 23.36.

9. King cobras (Ophiophagus hannah), Desert box Turtles (Terrapene ornata luteola), Three-toed box turtles (Terrapene

carolina triunguis) and Florida box turtles (Terrapene ornata bauri) are listed in CITES Appendix II.

10.   Federal law generally provides that all importers and exporters of fish or wildlife must file a completed Declaration for import or export (USFWS Form 3-177), that is signed by the importer or the importer's agent, exporter or the exporter's agent, upon the importation or exportation of any fish or wildlife at the place where USFWS clearance is requested.  See 50 CFR §§ 14.52, 14.61 and 14.63.

11.   Title 18, United States Code, Section 545 makes it unlawful for a person to "fraudulently or knowingly import[] or bring[] into the United States, any merchandise contrary to law, or receive[], conceal[], buy[], sell[], or in any manner facilitate[] the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law."

12.   Title 18, United States Code, Section 554 makes it unlawful for a person to "fraudulently or knowingly export or send from the United States, any merchandise, article or object contrary to law or regulation of the United States, or receive[], conceal[], buy[], sell[], or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be

intended for exportation contrary to any law or regulation of the United States."

13.   The Lacey Act, 16 U.S.C. § 3371, et seq., is a federal law that, among other things, makes it is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been or is intended to be either imported or transported in interstate or foreign commerce.   16 U.S.C. §§ 3372(d), 3373(d).

14.   Title 16, United States Code, Sections 1538(c), 1540(b), provide criminal sanctions for any person who knowingly engages in any trade in any specimens contrary to the provisions of CITES.

## IV. STATEMENT OF PROBABLE CAUSE

15.   On March 3, 2017, the Honorable Suzanne H. Segal, United States Magistrate Judge, issued an anticipatory search warrant based on an affidavit by USFWS Special Agent Stephanie Johnson.   I hereby incorporate the statements in that affidavit, which is attached as Exhibit 1, to support probable cause for the complaint and arrest warrant.   To summarize that affidavit, on March 2, 2017, a United States Customs and Border Protection inspection of a United States Postal Service parcel being imported from Hong Kong revealed three live king cobra snakes --

6

a legally-protected and highly venomous/deadly reptile -- each
of which was approximately two-feet long and three albino
Chinese soft-shelled turtles (that same day, a sender using the
same name attempted to export six CITES Appendix II protected
turtles).  Attached as Exhibit 2 to this affidavit are
photographs of the cans that cobras were imported in,
photographs of Wildlife Inspector Cory Kawabata opening one of
the cans (revealing one of the snakes), and a photograph of one
of the cobras in a tank at our USFWS office.

      16.   On March 3, 2017, I helped with the execution of the
anticipatory warrant mentioned above.  Specifically, on March 3,
2017, I watched as United States Postal Inspector Carl Nonas-
Truong delivered the parcel, containing Chinese albino soft-
shelled turtles, to the residence (Because the three cobras were
venomous, returning them to the package was itself dangerous,
and there was also danger to the community in delivering live
cobras, so the cobras were seized and not returned to the
package for delivery).  After the package was accepted, I
approached the apartment with SA Juan Ramirez Amezcua, SA
Johnson, SA Laura Chee, and SA Erin Dean, as well as multiple
Special Agents from Homeland Security Investigations ("HSI").

      17.   I assisted with the search of the apartment and found
that the parcel Postal Inspector Carl Nonas-Truong delivered had
been placed at the foot of the bed in what appeared to be a

children's bedroom.  In that same bedroom, I also saw a glass
tank containing a live baby crocodile, which was later
identified by Los Angeles Zoo Reptile Curator Ian Reccio as a
Morelet's crocodile (Crocodylus moreletti), and glass tanks
containing turtles, which were later identified by USFWS
Wildlife Inspector Joseph Ventura as three alligator snapping
turtles (Macrochelys temminckii), a common snapping turtle
(Chelydra serpentina), and five diamond back terrapins
(Malachlemys terrapin), all listed as CITES Appendix II.  I also
saw glass tanks containing a non-protected musk turtle and
various species of fresh water fish.

18.  During the execution of the warrant, I saw RODRIGO
FRANCO arrive at the apartment.  After his arrival, I observed
that he was interviewed by SA Johnson, SA Ramirez Amezcua and
Postal Inspector Carl Nonas-Truong.

19.  After we completed the execution of the warrant, I
reviewed the recording of FRANCO's interview and talked to SA
Johnson about the interview.  From these, I learned that FRANCO
told SA Johnson during the interview that he had received two
previous shipments of cobras in the mail.  FRANCO told SA
Johnson that he received about ten king cobras in the first
shipment and ten king cobras in the second shipment.  FRANCO
also told SA Johnson that the cobras in the two prior shipments
were dead on arrival, and that he knew from comments he read

online that "venomous were illegal."  FRANCO also told SA
Johnson that he had used the name "Carlos Sandoval" and shipped
out the six protected turtles that were intercepted at the mail
facility on March 2, 2017.  FRANCO initially denied knowing that
there were originally king cobras in the parcel that special
agents delivered to FRANCO on March 3, 2017, and claimed to have
only known about the three soft-shelled turtles in the parcel.
After being admonished by SA Johnson and Postal Inspector Nonas-
Truong that it was a crime to lie to federal agents, FRANCO
ultimately admitted that he knew the package being shipped to
his residence would contain at least one king cobra.

    20.   During the execution of the warrant, I collected
Franco's cellular phone ("iPhone") as evidence.

    21.   SA Johnson informed me of the following:

    a.   SA Johnson informed that, on March 6, 2017, she
shipped FRANCOS's iPhone to the USFWS Digital Evidence Recovery
and Technical Surveillance Unit ("DERTSU") in Jacksonville,
Florida.  DERTSU Senior SA David Johnson informed SA Johnson
that, on March 7, 2017, he received the iPhone and used a
Cellebrite Universal Forensic Extraction Device ("UFED") to
forensically extract the data, to include call history, text
messages, application communications, contacts, photographs and
videos from the cellular phone pursuant to the attached search

warrant.  The extracted data was then placed in files on a universal serial bus ("USB") flash drive.

      b.    On March 9, 2017, SA Johnson received the iPhone back from DERTSU SA David Johnson.

      c.    On March 10, 2017, the extracted data was transferred from DERTSU Senior SA David Johnson to DERTSU Senior SA Mark Sletto for forensic analysis, which included organizing the extracted data into electronic files and searching for keywords, such as "cobra," relevant to the import of the king cobras.

      d.    On April 21, 2017, SA Johnson received the complete extracted results on a USB flash drive from SA Sletto.

    22.    In April of 2017, I had several conversations with SA Johnson as she reviewed the evidence that had been recovered from FRANCO's iPhone.  I reviewed a report that SA Johnson prepared documenting conversations and photos that were recovered from FRANCO's cellular phone.  Based on conversations I had with SA Johnson and my review of her report, I learned the following:

      a.    FRANCO had been in communication with several individuals through the communication application "Whatsapp." Whatsapp is a free instant messaging platform for smartphones, which allows users to make calls, send images, videos and text messages.  These profiles were identified with Chinese

10

characters.  One such profile was also identified as an
individual in English as "Ji Anji."

b.    Recovered from the phone was a deleted
conversation between FRANCO and Ji Anji where they discussed
establishing a business relationship in which FRANCO would
purchase reptiles in the United States and then ship them to
Anji in Hong Kong.  In return, Anji would pay FRANCO with both
money, and reptiles, which included live king cobras.

c.    During this conversation, FRANCO told Anji that
he purchased several different box turtles for him.  On February
13, 2017, FRANCO asked Anji when he would be sending the albino
Chinese soft-shelled turtles.  In response, Anji wrote, "I want
to send u Chinese king cobra first because that's our first
business…Let's just finish the first deal, because I need to pay
180 dollars shipping fee for a parcel to smuggle to California."

d.    Anji sent FRANCO detailed instructions on how to
package the turtles in socks, including photos and a video.
When FRANCO informed Anji that he was shipping the turtles via
FedEx, Anji responded that he thought FedEx was "strict with
parcels."  FRANCO responded with the following, "FedEx no us
[sic] postal yes they open the package in front of you" and
"FedEx don't open it."

e.    FRANCO asked Anji if turtles were illegal to ship
to Hong Kong and Anji replied, "Do you remember u send me the

11

king and corn?"  FRANCO responded, "Yes but sent to China."
Anji replied, "Ahh, just like that time…HK it's very very easy."

     f.   On February 16, 2017, FRANCO sent Anji a message
with the address "1551 ridge crest St Apt G City Monterey Park
State California Zip 91754 Carlos Sandoval" and instructions to
ask for no signature required upon delivery.  Anji replied, "Ok
,ahh, as I send it, do not check the track number…If you want to
check the process ,just message me…Some guys were caught in USA
,because the company can follow their ip…If the parcel was
checked (worst consequence),u can say I don't know and they
can't check your follow recored[sic]."

     g.   On February 20, 2017, FRANCO asked Anji for a
photo of a king cobra and asked if they eat mice.  Anji replied
that they prefer snakes but will eat mice if there is snake
blood on them.

     h.   Between February 20 and February 26, 2017, FRANCO
and Anji negotiated for the purchase and shipment of six more
box turtles by FRANCO.  On February 26, 2017, Anji asked for a
phone number for shipping and instructed FRANCO to not use his
own phone number.

     i.   On March 3, 2017, Anji sent FRANCO a message
complaining about the slowness of the mail.  FRANCO sent Anji a
message and said, "Sorry friend."  Anji replied, "No!!  ...U

don't need to say sorry to me…This is the kc and albino soft shell…I should say sorry to u [*sic*]."

23.   Based on conversations that I had with SA Johnson and my review of her report, I also learned that she had asked FRANCO on March 3, 2017, March 10, 2017, March 31, 2017, and May 16, 2017 about what happened to the previous shipments of king cobras he had received from Hong Kong.  On each occasion, FRANCO told her the king cobras were "they're dead."  I also learned that FRANCO told her he received a shipment of king cobras approximately seven to eight months prior, and although he claimed they were "they're dead," FRANCO said that one of his contacts in China had a cousin that flew to Los Angeles from Virginia, collected the snakes, and returned to Virginia with the dead snakes.

24.   I also learned from SA Johnson's report, documenting conversations recovered from FRANCO's cell phone, that, on September 24, 2016, FRANCO had a conversation with an individual named "Liang" who said "My cousin will be there today."  FRANCO responded by saying "3 snakes didn't want to eat so they died today…only 5 still alive now…you can have my snake so your cousin can take all 5 snakes and I'll have my snakes next time ok."  Based on this evidence, I believe that Franco was untruthful when he told SA Johnson that the previous cobras that he had received had all died.

## V. CONCLUSION

25.   For all the reasons described above, there is probable cause to believe that FRANCO committed a violation of Title 18, United States Code, Section 545 (importing merchandise into the United States contrary to law).


_____
ADAM DIEHL, Special Agent,
USFWS

Subscribed to and sworn before me

this 21st day of July, 2017.


_____
HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

14

# Exhibit 1

AO93
(Rev.8/82)

**ANTICIPATORY SEARCH WARRANT ON WRITTEN AFFIDAVIT** COPY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>v. | DOCKET NO.   17MJ00482   MAGISTRATE'S CASE NO. |
| **THE PREMISES KNOWN AS:**<br>Location in which visual surveillance indicates the United States Postal Service package with tracking Number EA259339179HK has been accepted for delivery located at 1551 Ridge Crest Street, Apartment G, Monterey Park, California 91754 | **TO:**<br>**ANY SPECIAL AGENT(S) WITH THE UNITED STATES FISH AND WILDLIFE SERVICE OR ANY OTHER AUTHORIZED OFFICER** |

Affidavit having been made before me by the below-named affiant that he/she has reason to believe that on the premises known as

SEE ATTACHMENT A

in the Central District of California

there will be concealed certain property, namely:

SEE ATTACHMENT B

and as I am satisfied that there is probable cause to believe that <u>upon the occurrence of the triggering event described in Section VII of the search warrant affidavit</u>, the property so described will be concealed on the person or premises above-described and the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit which is incorporated herein by reference and attached hereto.

**YOU ARE HEREBY COMMANDED** to search on or before _____ **fourteen (14) days** _____ (not to exceed 14 days) the person or place named above for the property specified, serving this warrant and making the search at any time in the day or night <u>upon the occurrence of the event described above</u>, and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to <u>the duty U.S. Magistrate Judge</u> as required by law.

| NAME OF AFFIANT | SIGNATURE U.S. MAGISTRATE JUDGE** | DATE/TIME ISSUED |
|---|---|---|
| **Stephanie Johnson, United States Fish and Wildlife Service** | *Suzanne H. Segal*<br>The Honorable Suzanne H. Segal | 3/3/17   11:00am |

AUSA: Erik M. Silber

## ATTACHMENT A

PREMISES TO BE SEARCHED

The SUBJECT PREMISES to be searched -- only after the event that triggers the anticipatory search warrant, i.e. delivery and acceptance of the United States Postal Service package bearing Tracking Number EA259339179HK and addressed to Carlos Sandoval -- is located at 1551 Ridge Crest Street, Apartment G, Monterey Park, California 91754.  It is within the Ridgewood Apartments Complex.  The apartment is located on the second floor of a brown building with wooden siding in the middle of the complex. The building is identified with the number 1551.

i

[Non-Instrumentality Protocol]

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.     The items to be seized from 1551 Ridge Crest St. Apt
G, Monterey Park, California, 92843 (the "SUBJECT PREMISES")
constitute evidence, fruits, and/or instrumentalities of
violations of 16 U.S.C. §§ 1538(c), 1540(b), 50 C.F.R. §§ 23.13,
23.20 (illegally importing legally-protected animals); 16 U.S.C.
§§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label
for wildlife intended to be imported); and 18 U.S.C. § 545
(smuggling goods into the United States), namely:

     a.     A United States Postal Service package with
Tracking number EA 259339179HK and addressed to Carlos Sandoval
at 1551 Ridge Crest St, Apt G, Monterey Park, California 91754,
and its contents, including live Convention on the International
Trade in Endangered Species of Wild Fauna and Flora ("CITES")
protected wildlife.

     b.     Any other CITES-protected wildlife.

     c.     Records relating to the purchase, importation,
transportation, storage, possession, transfer, disposition,
trade, sale, offer to purchase, or offer for sale of CITES-
protected wildlife, including notes, memos, notebooks, books,
correspondence regarding CITES-protected wildlife, invoices,
shipping records, packing slips, facsimiles, purchase orders,
bills of sale, shipping records, letters of credit, permits,
customs forms, contracts, importation documents, receipts,
customer lists, price lists, financial records, cancelled
checks, check book ledgers, money orders, wire transfers, bank

ii

[Non-Instrumentality Protocol]

statements, international bank transfer statements, cashier checks, cash, credit card statements, personal telephone directories, and photographs; and

     d. Records and documents reflecting communications with government agencies, consumer associations, and business associations about CITES-protected wildlife, or the requirements for the importation or exportation of wildlife under CITES, including documents or licenses regarding compliance or non-compliance with governmental rules and regulations, or declarations, permits, and licenses required by governmental rules and regulations to import, export, or transport wildlife products.

     e. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

       i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

       ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

iii

[Non-Instrumentality Protocol]

as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.   evidence of the times the device was used;

       vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

       vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       viii.    records of or information about
Internet Protocol addresses used by the device;

       ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,

iv

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in

v

[Non-Instrumentality Protocol]

their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

   b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

vi

[Non-Instrumentality Protocol]

Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the

[Non-Instrumentality Protocol]

time for searching the device has expired) absent further court order.

g.   The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

viii

[Non-Instrumentality Protocol]

   c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

   d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

   e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

   f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

   g.    Any passwords, password files, test keys,
encryption codes, or other information necessary to access the
digital device or data stored on the digital device.

   6.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

ix

[Non-Instrumentality Protocol]

## AFFIDAVIT

I, Stephanie Johnson, being duly sworn, declare and state
as follows:

## I.    INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of the
Interior, United States Fish and Wildlife Service ("USFWS"),
Office of Law Enforcement, stationed in Torrance, California.  I
am authorized by the Secretary of the Interior to conduct
searches and seizures and to make arrests, as authorized by law,
pursuant to the Lacey Act, Title 16, United States Code, Section
3371 et seq.  I am an investigative law enforcement officer of
the United States within meaning of Title 16, United States
Code, Section 3375, and a federal law enforcement officer within
the meaning of Rule 41(a) of the Federal Rules of Criminal
Procedure.  I have been so employed since August of 2011.

2.    As a USFWS SA, I have conducted, or been involved in,
multiple search warrants relating to the illegal
commercialization of protected fish and wildlife, and violations
of federal fish and wildlife laws.  I have read, studied, and
received training on the laws enforced by the USFWS.  I have
also received advanced training in numerous aspects of criminal
investigative techniques, including electronic surveillance and
the application of undercover techniques for criminal
investigations.

## II.   PURPOSE OF THIS AFFIDAVIT

3.    This affidavit is made in support of an application
for an anticipatory search warrant for the premises located at
1551 Ridge Crest Street, Apartment G, Monterey Park, California
91754 (the "SUBJECT PREMISES") for evidence, fruits, and/or
instrumentalities of violations of 16 U.S.C. §§ 1538(c),
1540(b), 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally-
protected animals); 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i)
(submitting a false record or label for wildlife intended to be
imported); and 18 U.S.C. § 545 (smuggling goods into the United
States).  This anticipatory search warrant will be executed only
upon the receipt of the United States Postal Service parcel
described below by an individual at the SUBJECT PREMISES and the
occurrence of the circumstances described in Section VII of this
affidavit.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and/or
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

2

[Non-Instrumentality Protocol]

III.   PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED

5.   The SUBJECT PREMISES is located at 1551 Ridge Crest Street, Apartment G, Monterey Park, California 91754, and is described in detail in Attachment A, which is incorporated herein by reference.

6.   The items to be seized, which constitute evidence, fruits, and/or instrumentalities, of violations of 16 U.S.C. §§ 1538(c), 1540(b); 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally-protected animals), 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported), and 18 U.S.C. § 545 (smuggling goods into the United States), are listed in Attachment B, which is incorporated herein by reference.

IV.   SUMMARY OF PROBABLE CAUSE

7.   Yesterday, on March 2, 2017, a customs check of a United States Postal Service parcel being imported from Hong Kong revealed three live King Cobra snakes -- a legally-protected and highly venomous/deadly reptile -- each of which was approximately two-feet long.

V.   APPLICABLE LAW

8.   The Endangered Species Act is a federal law that, among other things, regulates the importation and exportation of certain wildlife and plants to and from the United States, and implements the United States' obligations under the Convention

3

[Non-Instrumentality Protocol]

on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

9.    CITES is an international treaty among approximately 183 nations, including the United States and China, that establishes certain requirements that must be met before CITES-protected wildlife may be imported or exported from signatory nations.  Wildlife protected under CITES is divided into Appendices I, II, and III.  Wildlife listed in Appendix I have the highest level of protection and include those species threatened with the immediate risk of extinction.  Wildlife listed in Appendix II are considered at risk for becoming endangered and require permits for import.

10.    Title 50, Code of Federal Regulations, Section 23.13 generally provides that it is unlawful for any person subject to the jurisdiction of the United States to attempt to import or engage in international trade with, any specimen of a species listed in CITES Appendix I, II, and III.  All wildlife listed in Appendix I may only be legally imported into the United States when accompanied by a CITES import permit issued by the United States and a CITES export permit or re-export certificate issued by the country from which the wildlife is exported.  All CITES Appendix II wildlife may only be imported into the United States when accompanied by an export permit or re-export certificate from the country from which the wildlife is being exported.  50 C.F.R. §§ 23.20(e), 23.35, 23.36.

11.    King cobras (Ophiophagus hannah) are listed in CITES Appendix II.

4

[Non-Instrumentality Protocol]

12.   Title 16, United States Code, Sections 1538(c), 1540(b), provide criminal sanctions for any person who knowingly engages in any trade in any specimens contrary to the provisions of CITES.

13.   Title 18, United States Code, Section 545 makes it unlawful for a person to "fraudulently or knowingly import or bring into the United States, any merchandise contrary to law, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law."

14.   The Lacey Act, 16 U.S.C. § 3371, et seq., is a federal law that, among other things, makes it is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been or is intended to be either imported or transported in interstate or foreign commerce.   16 U.S.C. §§ 3372(d), 3373(d).

15.   Federal law generally provides that all importers of wildlife must file with the USFWS a completed Declaration for Importation or Exportation of Fish or Wildlife (Form 3-177), that is signed by the importer or the importer's agent, upon the importation of any wildlife at the place where USFWS clearance is requested.   See 50 CFR §§ 14.61 and 14.52.

5

[Non-Instrumentality Protocol]

## VI.   STATEMENT OF PROBABLE CAUSE

16.   On March 2, 2017, I was informed by USFWS Wildlife Inspector ("WI") Cory Kawabata that USFWS WI Leticia Hale had received a call from United States Customs and Border Protection ("CBP") Agriculture Specialist Susan Terlan.  I learned from WI Kawabata that a CBP officer had found a package containing turtles and possibly snakes at the United States Postal Service ("USPS") International Mail Facility ("IMF") on Denker Street, in Torrance, CA.  At that time, I asked WI Kawabata, FWS WI Frank Chu, and USFWS SA Laura Chee to go with me to the mail facility to inspect the package.

17.   On that same day, March 2, 2017, after arriving at the IMF, I met with Agricultural Specialist Terlan who pointed to a box on an inspection table that appeared to have been opened (the "SUBJECT PARCEL").  Inside the box was another Styrofoam box with holes poked in the sides.  Inside the Styrofoam box, I saw what appeared to be several small packages of commercially packaged food items.  As I examined the contents, CBP Agriculture Specialist Jaime Pimentel brought a white container with what appeared to be three small round cardboard canisters similar to "Pringles" chips containers (but about half the size) and one small clear plastic bottle.  I examined the clear plastic bottle and saw what I recognized as an albino Chinese soft-shelled turtle, which I know from my experience is noted CITES-protected.  Agriculture Specialist Pimentel said that they thought there were snakes in the chip containers.

6

[Non-Instrumentality Protocol]

18.  On that same day, Agriculture Specialist Pimentel told me that he was the individual who found the wildlife.  He told me that he was looking through a bin of mail from Hong Kong and specifically selected this package because he recognized the shipper's address in Hong Kong as a known shipping address for drugs.  Agriculture Specialist Pimentel told me that he did not x-ray the package, but instead opened it looking for drugs.  He said that after he opened the package, he looked at the clear plastic bottle and saw the holes in the side.  He said he then noticed something moving inside and stopped and called the USFWS.

19.  As I examined the label on the SUBJECT PARCEL, I recognized the shipping address of "No. 122 Hong Kong Steer Kowloon Bay, Kowloon Bay, Hornijaan, Hong Kong."  From September 2015 through September of 2016, I seized three packages of undeclared wildlife originating from the address of "No. 122 Hong Kong Steer Kowloon Bay, Kowloon Bay, Hornijaan, Hong Kong."

20.  The declared description of contents of the SUBJECT PARCEL was "Porcelain cup sample."  I recognized that the contents declaration was the same declaration the shipper had used on the previously seized packages.

21.  In addition to the address and the contents, I also recognized the handwriting to be the same as the previous packages.  The package was addressed to an individual named "Carlos Sandoval" at 1551 Ridge Crest St, Apt G, Monterey Park, CA 91754 (SUBJECT PREMISES).  Also listed on the package was a

[Non-Instrumentality Protocol]

phone number of 1-626-922-3614, and a tracking number of EA 259339179HK.

22.    While investigating the origin of the previous packages from "No. 122 Hong Kong Steer Kowloon Bay, Kowloon Bay, Hornijaan, Hong Kong" in 2015 and 2016, I identified the foreign supplier as Hou Xiao Chen ("Chen"). Based on that investigation, I also know that Chen uses the name "Chen Wen Bin" on Facebook. In November of 2016, I contacted Chen through Facebook and asked if he had any Chinese albino soft-shelled turtles for sale. At the time, Chen told me he would sell them to me for $200 each, plus shipping. When I told Chen that I did not want to pay shipping, he offered to consolidate them into a shipment to another person in California. During that conversation, I asked Chen for a list of animals that he was willing to sell. At the time, Chen sent me a link to a list containing the scientific names of snakes, frogs, salamanders, and turtles. I remember conducting an open internet search of the names of snakes and found that several of the species were venomous. I never completed a purchase from Chen.

23.    On March 2, 2017, because of concern over the potential of a venomous animal based on my previous discussions with Chen, I directed the Wildlife Inspectors and the CBP Agricultural Specialists to not open the small potato chip canisters until we could take them to a more controlled and safe environment. However, while I was interviewing Agricultural Specialist Pimentel (described above), WI Kawabata opened one of the canisters and verified there was a snake inside (at the

8

[Non-Instrumentality Protocol]

time, the snake was passive and did not attempt to strike at WI Kawabata).  Thereafter, we put the canisters through the CBP x-ray machine.  The image of the x-rayed canisters appeared to depict a snake in each of the three canisters.

24.  On March 2, 2017, I took photographs of the package, seized the package containing the wildlife, and returned to the office.  Later that afternoon, WI Chu and USFWS WI Jeremiah McDaniel were able to safely remove the snakes from the canisters and place them into separate glass tanks.  Later, WI Chu and WI Joseph Ventura identified the snakes as King Cobras (Ophiophagus hannah).  Additionally, USFWS SA Erin Dean told me that she sent photos of the cobras to Ian Reccio, the Reptile Curator at the Los Angeles Zoo ("LA Zoo"), who called her and confirmed that they were King Cobras.  Each of the King Cobras was approximately two feet long.  I have attached a photograph of one of the cobras (and the container it came in) in Exhibit A.

25.  SA Erin Dean also told me that she spoke with Curator Reccio about guidance on the handling of the cobras.  She told me that, when she asked him if he would be able to house them at the LA Zoo, Curator Reccio said that he could not because they do not have any anti-venom on site and the closest location of anti-venom was the San Diego Zoo, which was too far away to treat any bite.  Curator Reccio told SA Dean that if someone had been bitten by one of the cobras, they likely would have died as there is not a ready source of anti-venom that he knew about in Los Angeles.

9

26.  On March 2, 2017, after seizing the SUBJECT PARCEL, I received a phone call from USFW SA Juan Ramirez, informing me that another package had been found at the United States Postal Service International Service Center near Los Angeles International Airport containing live turtles that was going to be exported to Hong Kong.  I responded to the facility with SA Laura Chee.  After arriving on site, FWS WI Jan Yanabu showed me a box they had opened that contained multiple species of turtles that were wrapped in socks and packing tape.  I examined the label and saw that it was addressed from "Carlos Sandoval" – the same name as the SUBJECT PARCEL above -- with an address of 3718 Hammel Street, Los Angeles, California 90063.  It was addressed to "MTWT" in Hong Kong.  There were six turtles total, and they were preliminary identified by WI Joseph Ventura as Desert Box Turtles (Terrapene ornata luteola), Three-Toed Box Turtles (Terrapene carolina triunguis) and Ornate Box Turtles (Terrapene ornata ornata).  All of these species are protected as CITES Appendix II.

27.  On March 2, 2017, SA Chee told me that she conducted a searched in the TLO Trans-Union Intelligence ("TLO") database and learned that six people appeared to live at the SUBJECT PREMISES, among which were the names Jose Franco and Rodrigo Franco.  The TLO database contains records related to ownership and occupancy of property, personal identity, employment, vehicle registration, and other such records that are available with a subscription.

[Non-Instrumentality Protocol]

28.   On March 2, 2017, after I learned the names of some of the residents at the SUBJECT PREMISES, I searched the Facebook page belonging to Chen and found the name "Rod Franco" listed as one of his friends.  When I searched the Facebook page for Rod Franco, I saw that he was a member of several classified groups, such as "Asian reptile & amphibians discussion and classify", "Creepy Crawlies Reptile and exotics rescue," and "WWPS Online Reptile Store."  Franco's Facebook page showed that he lived in Monterey Park, California, which is where the SUBJECT PREMISES is located.

29.   On March 2, 2017, I conducted a search in the USFWS Law Enforcement Management Information System ("LEMIS") for the name Rodrigo Franco.  LEMIS is a database maintained by the USFWS that contains records involving the importation and exportation of wildlife, including permits and declarations, as well as records of wildlife investigations.  During the search, I discovered an open investigation for the name Rodrigo Franco, which I also then remembered having previously discussed with the case agent for that investigation, SA Ramirez.  LEMIS identified that that package was intercepted at the IMF in January of 2017 and contained two live turtles (<u>Platysernon megacephalum</u>) and one dead turtle (<u>Carettochelys insculpta</u>), which are both listed as CITES Appendix II species.  LEMIS identified that that package was addressed to "Carlos Sandoval" at an address of 1027 West Louisa Ave, West Covina, CA 91970, and the address that that package was shipped from was "No. 122 Hong Kong Steer Kowloon Bay, Kowloon Bay, Hornijaan, Hong Kong,

11

[Non-Instrumentality Protocol]

which is the same address as the sender of the SUBJECT PARCEL
above.  From my previous discussion with SA Ramirez, I remember
that that package was declared to contain "porcelain cup
samples," like the SUBJECT PARCEL above.

30.  On March 2, 2017, I called SA Ramirez, and I asked him
about his investigation.  He told me that a recipient phone
number had been listed on the package he intercepted and that,
when he searched the number in the TLO database, he learned that
it was registered to a Rodrigo Franco.  SA Ramirez said that,
later, he found a Facebook page for the owner of the residence
of the West Covina address and saw that she was friends with a
Rod Franco.

31.  On March 2, 2017, I conducted a search in the LEMIS
database for Rodrigo Franco and I was unable to locate any
import declarations, or CITES permits under that name.  I also
conducted the same search for the names Carlos Sandoval, Hou
Xiao Chen, and Chen Wen Bin and could not locate any import
declarations or CITES import permits.

32.  Based on my training and experience (and information
provided to me by other experienced USFWS special agents with
whom I work), I have learned that individuals who traffic in
CITES-protected wildlife, such as here, also traffic in other
types of CITES-protected wildlife.  Thus, there is probable
cause to believe that additional CITES-protected animals will be
found at the SUBJECT PREMISES, particularly given the
previously-seized shipment in January and the outbound package
in the name of Carlos Sandoval seized on March 2, 2017, both of

12

[Non-Instrumentality Protocol]

which had different types of CITES-protected wildlife (turtles) than the SUBJECT PARCEL.

33. Based on my training and experience (and information provided to me by other experienced USFWS special agents with whom I work), I have learned that individuals who illegally import CITES-protected wildlife to their residences are likely to keep equipment, records, and/or correspondence related to illegal importations at their residence.

34. The package (SUBJECT PARCEL) that was intercepted on March 2, 2017, was being shipped from an overseas shipper in Hong Kong. Based on my training and experience (and information provided to me by other experienced USFWS special agents with whom I work), I have learned that international trafficking of wildlife are often facilitated using e-mail and/or text messages and, thus, there is probable cause to believe that digital evidence related to the unlawful wildlife trafficking in this case will be found at the SUBJECT PREMISES.

35. Because of the danger associated with the cobras, including to USFWS employees in attempting to get the cobras back into the package and the danger to the public if the cobras are delivered, the USFWS does not intend to actually deliver the cobras (the turtles, however, will be returned to the box).

13

[Non-Instrumentality Protocol]

## VII.   CIRCUMSTANCES THAT WILL ACTIVATE THE ANTICIPATORY SEARCH WARRANT FOR THE SUBJECT PREMISES

36.   The anticipatory search warrant to search the SUBJECT PREMISES described herein will be triggered by the following circumstances:

a.   Within the allowable time prescribed by the warrant, an individual working with law enforcement, acting in an undercover capacity as a USPS carrier, will deliver the SUBJECT PARCEL to the SUBJECT PREMISES.

b.   It is anticipated that the SUBJECT PARCEL containing the wildlife will be accepted by an individual who is present at SUBJECT PREMISES and will be taken inside the SUBJECT PREMISES.  The SUBJECT PARCEL will be kept under observation using physical surveillance until the time that it is taken into the residence.  Once the SUBJECT PARCEL has been delivered and taken inside the SUBJECT PREMISES, USFWS SAs will wait between one to 30 minutes before entering the SUBJECT PREMISES.  Thus, the triggering event to activate this anticipatory search warrant, and permit its execution, will be delivery and acceptance of the SUBJECT PARCE; at the SUBJECT PREMISES.

## VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

37.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

14

[Non-Instrumentality Protocol]

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in

[Non-Instrumentality Protocol]

the types of digital devices, operating systems, or software applications that are being searched.

b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

16

[Non-Instrumentality Protocol]

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular

17

[Non-Instrumentality Protocol]

user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

e.  Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal

18

[Non-Instrumentality Protocol]

information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a

19

[Non-Instrumentality Protocol]

controlled laboratory environment, and can require substantial time.

g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

38. The USFWS has only five local agents and no local forensic examiners. On March 2, 2017, USFWS Torrance Office

20

[Non-Instrumentality Protocol]

Resident Agent in Charge Erin Dean told me that she had attempted to contact nearby forensic examiners, but was unable to find a forensic examiner to participate in the execution of the warrant on March 3, 2017. We need to execute the warrant on March 3, 2017, because the SUBJECT PARCEL is supposed to be delivered on March 3, 2017. I know, including from different search warrants obtained and executed with similar circumstances, that we have a difficult time getting forensic assistance from other federal agencies on search warrants on short notice. I, thus, intend to seize digital devices during the execution of the search warrant and send them to our Digital Evidence Recovery and Technical Surveillance Unit located in Jacksonville, Florida, for imaging, and will promptly return the digital devices to residence.

39.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

21

[Non-Instrumentality Protocol]

## IX.   CONCLUSION

40.   For all the reasons described above, I respectfully submit that there is probable cause to believe that evidence, fruits, and/or instrumentalities of violations of 16 U.S.C. §§ 1538(c), 1540(b), 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally-protected animals); 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported); and 18 U.S.C. § 545 (smuggling goods into the United States) will be found at the SUBJECT PREMISES.

/s/
_____
STEPHANIE JOHNSON, Special
Agent, USFWS

Subscribed to and sworn before me
this 3rd day of March, 2017.

_____
HONORABLE SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

22

[Non-Instrumentality Protocol]

# Exhibit A



Exhibit 2

## EXHIBIT 2

Pphotograph of the cans the cobras were imported in



Photograph of the cans the cobras were imported in



Photograph of Wildlife Inspector Cory Kawabata opening one of

the cans (revealing the snake)



Photograph of Wildlife Inspector Cory Kawabata opening one of

the cans (revealing the snake)



Photograph of one of the cobras in a tank at our USFWS office

