NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
ERIK M. SILBER (Cal. Bar No. 190534)
Assistant United States Attorney
Environmental and Community Safety Crimes Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2231
     Facsimile: (213) 894-8513
     E-mail:    Erik.Silber@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 17-523-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RODRIGO FRANCO |
| v. | |
| RODRIGO FRANCO, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Erik M. Silber, hereby provides its sentencing position.

///

///

This sentencing position is based on the attached memorandum of points and authorities, the Presentence Report ("PSR"), and the file and records in this case.

Dated: January 11, 2018

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

       /s/
ERIK M. SILBER
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant Rodrigo Franco ("defendant") smuggled 23 King Cobras into the United States in three separate shipments, one that was intercepted by federal agents (containing three King Cobras) and two that were not intercepted (containing 20 King Cobras) that defendant later admitted to smuggling. King Cobras are venomous snakes that are: (1) legally protected because they are a vulnerable species at risk for extinction; and (2) deadly because they possess lethal venom that can kill an adult within 30 minutes if the person is bitten and anti-venom is not available (and, at the time of the offense, there was no known King Cobra anti-venom in Los Angeles).

In addition to the King Cobras, the United States Fish and Wildlife Service ("USFWS") intercepted packages that defendant was shipping outside of and into the United States using a false name that contained protected turtles and USFWS found other protected wildlife in defendant's residence during the search.

## II. PROBATION OFFICE'S RECOMMENDATION OF 10 MONTHS IN PRISON

The Probation Office identifies that defendant has a Guideline range of 10-16 months in prison based on a total offense level of 12 and a criminal history category of I. (PSR Guideline Summary.) The offense level is based on: (1) a base offense level of six under USSG § 2Q2.1(a); (2) a two-level enhancement for a pattern of similar violations under USSG § 2Q2.1(b)(1)(B); (3) a six-level enhancement

1

because the value of the protected animals was more than $40,000 (but not more than $95,000) under USSG §§ 2Q2.1(b)(3)(B) and 2B1.1(b)(1)(D); and (4) a two-level reduction for acceptance of responsibility under USSG § 3E1.1. (PSR ¶¶ 27-37.) The government agrees with those offense level calculations. The base offense level and enhancements were all agreed to by the parties on page seven of the plea agreement.

In its recommendation letter, the Probation Office recommends a sentence of 10 months in prison, which is the low-end of the Guideline range. As contemplated on page three (paragraph 3(d)) and page nine (paragraphs 16 and 17) of the parties' plea agreement, the government seeks an above-Guideline sentence of 18 months in prison as a result of the risk to public safety associated with defendant's criminal conduct and that risk is not otherwise reflected in defendant's Guideline range. Specifically, the government seeks an 18-month sentence because of the seriousness of the offense, 18 U.S.C. § 3553(a)(2)(A), to protect the public, 18 U.S.C. § 3553(a)(2)(C), and to provide adequate deterrence, 18 U.S.C. § 3553(a)(2)(B).

III. THE GOVERNMENT SEEKS AN 18-MONTH PRISON SENTENCE

A. DEFENDANT'S OFFENSE WAS DANGEROUS TO HUMAN LIFE, WHICH WAS NOT REFLECTED IN THE GUIDELINE RANGE

As the Probation Office stated, "[w]hat is particularly concerning in this case is the brazen nature of [defendant's]

conduct. There was an inherent risk of injury and possible death associated with the concealment of the King Cobras." (Recommendation Letter at 4.) In particular, as the affidavit in support of the search warrant notes, there was no known King Cobra anti-venom in Los Angeles at the time of the offense. (Exhibit A at 35). Because of the lack of anti-venom, the reptile curator of the Los Angeles Zoo indicated that, "if someone had been bitten by one of the cobras, they likely would have died." (Id.) Known local anti-venom is critical because, as the Probation Office identified, "[i]f an individual was bit by a King Cobra, anti-venom would need to be administered within 30 minutes of the bite, or the bite would likely be fatal to the victim." (PSR ¶ 18.) Thus, as the Probation Office stated, "[t]here is an inherent risk of death associated with the transportation of King Cobras without the knowledge that King Cobras are located in the package." (Id.)

That risk of death to an innocent person in this case was not theoretical. As the Probation Office identified, "[t]here were instances where this danger presented itself in this case." (PSR ¶ 18.). Specifically, a USFWS wildlife inspector, when inspecting one of the three potato chip canisters each containing a concealed King Cobra, opened it, not knowing a venomous snake was hidden inside. The Court can see below how close the inspector's hand came to the concealed King Cobra in that canister:

3



(<u>See also</u> Exhibit A at 53.)   That cobra was passive.   The King Cobras in each of the other two canisters were not passive:



4

(See also Exhibit A at 54 (same photo of one of the cobras in striking position; Exhibit C (video of that cobra later striking the glass).)

As the report attached as Exhibit B indicates, unlike with the passive King Cobra that the wildlife inspector encountered, the King Cobra above "was extremely aggressive and was striking against the glass at anything that came near it" (the same report noted that the third King Cobra exhibited the same agitated behavior as the second King Cobra). Had the wildlife inspector opened a canister with one of the two aggressive King Cobras concealed inside, she easily could have been bitten and killed as a result of defendant's conduct.

Similarly, when different wildlife inspectors were later removing the King Cobras from the canisters at the USFWS's office in Torrance, they still did not know what type of snakes were involved, although they thought they might be venomous snakes of some kind. (See Exhibit B.) Not knowing that anti-venom was unavailable for this type of snake, when attempting to free the passive King Cobra from the canister, one inspector put his hand in the tank and used it to "pop[] open the edge of the lid." After that snake was removed from the canister, it "wasn't moving."[1] Again, had the inspector instead opened one of the two canisters containing the aggressive cobras, the

---

[1] The report describes the passive snake as appearing to "be sick or injured as [it] was not aggressive as the other two and it was also less active." One of the cobras ultimately died. The government suspects that the non-aggressive cobra was the one that passed away, which would explain its non-aggressive behavior.

5

King Cobra easily could have bitten the wildlife inspector's hand, which was in close proximity to the cobra, likely killing him.

Moreover, during the investigation, USFWS did a controlled delivery of the package previously containing the King Cobras (because of the danger associated with them, the USFWS did not put the cobras back in the package for the delivery). Defendant was not home at the time of delivery of the package, but other family members were and accepted the package. After the delivery, during the resulting search, USFWS special agents found the package that should have contained three deadly King Cobras in defendant's young children's room, which was also the room in defendant's residence containing all of the reptiles and fish (see below and PSR ¶ 15), suggesting it was where defendant intending to keep the cobras:





(See the package by the foot of the child's bed.)

The risk to defendant's elementary-school-age children involving the King Cobras was significant, as they could not fully appreciate the danger involved with them. And, as the Probation Office noted, "the package was delivered to an apartment complex containing several units. If the cobras had escaped, the other residents could have also been placed at risk." (Recommendation Letter at 4).

Indeed, if the King Cobras had escaped, defendant's offense risked death anywhere along the route the package was supposed to take: On the flight from Hong Kong, at the sorting center in Los Angeles, on the delivery vehicle taking the King Cobras to defendant's residence, at defendant's apartment complex, in the neighborhood surrounding

7

defendant's apartment complex, etc. (See, e.g., PSR ¶¶ 18(a)-(c).) This serious risk to public safety is not actually accounted for in defendant's Guideline range, which focuses on wildlife trafficking, thereby supporting an above-Guideline sentence.

The Guidelines nevertheless also support an enhanced sentence based on danger here. Specifically, the Sentencing Guidelines have an enhancement that focuses on the danger associated with offense, applying a two-level enhancement if the offense "involved fish, wildlife, or plants that were not quarantined as required by law" or "otherwise created a significant risk of infestation or disease transmission potentially harmful to humans, fish, wildlife, or plants." USSG § 2Q2.1(b)(2). By its literal terms, this provision does not apply. Yet defendant's offense conduct is similarly dangerous -- but actually more so -- than the potential harm from disease transmission. Since a two-level enhancement applies there, by analogy, a similar enhanced sentence should apply here.

If Section 2Q2.1(b)(2) had applied here, defendant would have received a two-level enhancement, bringing his offense level to 16 before acceptance. With an offense level of 16, defendant would have received a three-level reduction for acceptance under USSG § 3E1.1, as opposed to the two-level he actually received with an offense level of 14. Because of the extra one-level reduction for acceptance, had Section 2Q2.1 applied here, it would have only functionally raised defendant's offense by one level, to offense

8

level 13. With that offense level and a criminal history category of I, defendant would have a Guideline range of 12-18 months in prison. The government recommends 18 months here, the high end of that range, because defendant's conduct was more dangerous to human life than what is required to trigger the two-level enhancement in Section 2Q2.1(b)(2). The Guidelines, thus, support the government's recommended 18-month sentence and the Guidelines demonstrate that the danger to human life associated with defendant's offense should receive an enhanced sentence.

B. OTHER FACTORS SUPPORT AN 18-MONTH SENTENCE

Additional factors warrant a significant sentence here. First, such a sentence is needed to deter other defendants from engaging in similar behavior. Without a substantial prison sentence here, other defendants may endanger public safety by attempting to bring deadly animals into the United States.

Second, as identified in Exhibit A, defendant was untruthful with special agents about his prior smuggling of 20 King Cobras. Defendant stated that they all died, meaning there was no continuing risk to the public from them (Exhibit A at 9, 14), but electronic evidence showed defendant stating: (1) in one of the shipments, although some had died, five had lived; and (2) offering those five to a relative of the seller in the United States. (Exhibit A at 14). As USFWS Special Agent Diehl stated, "I believe that [defendant] was untruthful when he told SA Johnson that the previous cobras that he

9

had received had all died." (Id.)  Defendant's untruthfulness, which undermined the protection of the public, suggests a greater need to protect the public from defendant in the future.

Third, King Cobras, in addition to being deadly, are protected because they are vulnerable to extinction and one of the things that makes them, and other protected wildlife, vulnerable is the commercial pet trade.  As identified in the plea agreement, the snakes are highly valuable and are worth $2,000 a snake.  Defendant's offense resulted in multiple cobras dying (one from the current shipment and several from prior shipments), highlighting the seriousness of the offense, 18 U.S.C. § 3553(a)(2)(A).  And his involvement in the wildlife trade (snakes, turtles, and other reptiles) is part of the reason why they need protection in the first place.  A significant prison sentence is needed because of the seriousness of the offense and to deter others from similar conduct.

Finally, the government notes that there is mitigating evidence in this case, including defendant's lack of criminal history and early acceptance of responsibility (including pleading guilty prior to indictment).  That evidence is undermined slightly by defendant's course of conduct over time: importing three shipments of cobras and one separate shipment of turtles and exporting one shipment of turtles, all of over several months.  But, regardless, when this mitigating evidence is balanced together with the aggravating factors above, an 18-month sentence is appropriate.