# EXHIBIT A

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. RODRIGO FRANCO | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. |

Complaint for violation of Title 18, United States Code, Sections 545, 2(b) (unlawfully importing, and willfully causing the unlawful importation of, merchandise into the United States contrary to law)

| NAME OF MAGISTRATE JUDGE HONORABLE JOHN E. MCDERMOTT | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE March 2, 2017 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) 1551 Ridge Crest Street, Apartment G, Monterey Park, CA |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

## [18 U.S.C. §§ 545, 2(b)]

On or about March 2, 2017, in the County of Los Angeles, within the Central District of California, and elsewhere, defendant RODRIGO FRANCO knowingly and fraudulently, imported and brought, and caused to be imported and brought, merchandise, namely three King Cobras (*Ophiophagus hannah*), into the United States contrary to law, that is: (1) without reporting or declaring said King Cobras to the United States Fish and Wildlife Service, in violation of Title 50, Code of Federal Regulations, Section 14.61; and (2) without obtaining the necessary documents under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), in violation of the Endangered Species Act, Title 16, United States Code, Sections 1538(c) and 1540(b), and CITES, Title 50, Code of Federal Regulations, Sections 23.13(a) and 23.20(e).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **ADAM DIEHL** |
|---|---|
| | OFFICIAL TITLE SA, U.S. Fish and Wildlife Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE July 21, 2017 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Erik Silber x12231 REC: bond

### AFFIDAVIT

I, Adam Diehl, being duly sworn, declare and state as
follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of the
Interior, United States Fish and Wildlife Service ("USFWS"),
Office of Law Enforcement ("OLE"), stationed in Torrance,
California.  I am authorized by the Secretary of the Interior to
conduct searches and seizures and to make arrests, as authorized
by law, pursuant to the Lacey Act, Title 16, United States Code,
Section 3371 et seq.  I am an investigative law enforcement
officer of the United States within meaning of Title 16, United
States Code, Section 3375, and a federal law enforcement officer
within the meaning of Rule 41(a) of the Federal Rules of
Criminal Procedure.  I have been so employed since May of 2016.

2.    I was previously employed as a Special Agent with the
Department of Justice, Drug Enforcement Administration ("DEA")
in Los Angeles, California for approximately two years, and a
Law Enforcement Officer with the United States Forest Service,
Law Enforcement and Investigations in Southern California for
approximately six years.  I received a Bachelor's degree in
Social and Criminal Justice from Ashford University in July of
2013.  I am also a graduate of the Fullerton College Police

2

Academy in Fullerton, California, the Land Management Police Training Program at the Federal Law Enforcement Training Center in Glycol, Georgia, the DEA Basic Special Agent Academy in Quantico, Virginia, and the USFWS Special Agent Basic School ("SABS") at the Federal Law Enforcement Training Center in Glycol, Georgia.

3. During the last nine years, I have conducted several complex investigations involving the protection of natural resources and United States government property, arson, firearms violations, narcotics trafficking, money laundering, and fish and wildlife violations. Since my employment with the USFWS in 2016, I have conducted, or been involved in, multiple investigations relating to the illegal commercialization of protected fish and wildlife, and violations of federal fish and wildlife laws. I have read, studied, and received training on the laws enforced by the USFWS. I have also received advanced training in numerous aspects of criminal investigative techniques, including electronic surveillance and the application of undercover techniques for criminal investigations.

## II. PURPOSE OF THIS AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint against and arrest warrant for RODRIGO FRANCO for a violation of Title 18, United States Code, Section 545 (importing merchandise into the United States contrary to law).

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. APPLICABLE LAW

6.    The Endangered Species Act is a federal law that, among other things, regulates the importation and exportation of certain wildlife and plants to and from the United States, and implements the United States' obligations under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES").

7.    CITES is an international treaty among approximately 183 nations, including the United States and China, that

3

establishes certain requirements that must be met before CITES-protected wildlife may be imported or exported from signatory nations.  Wildlife protected under CITES is divided into Appendices I, II, and III.  Wildlife listed in Appendix I have the highest level of protection and include those species threatened with the immediate risk of extinction.  Wildlife listed in Appendix II are considered at risk for becoming endangered and require permits for import and export to and from the United States.

8.   Title 50, Code of Federal Regulations, Section 23.13 generally provides that it is unlawful for any person subject to the jurisdiction of the United States to attempt to import, export, re-export, or engage in international trade with, any specimen of a species listed in CITES Appendix I, II, and III. All CITES Appendix II wildlife may only be imported into the United States when accompanied by a foreign CITES export permit or re-export permit from the Management Authority of the country from which the wildlife is being exported, and may only be exported from the United States when accompanied by a CITES export permit or re-export permit issued by the United States. 50 C.F.R. §§ 23.20(e), 23.35 and 23.36.

9.   King cobras (Ophiophagus hannah), Desert box Turtles (Terrapene ornata luteola), Three-toed box turtles (Terrapene

4

carolina triunguis) and Florida box turtles (Terrapene ornata bauri) are listed in CITES Appendix II.

10. Federal law generally provides that all importers and exporters of fish or wildlife must file a completed Declaration for import or export (USFWS Form 3-177), that is signed by the importer or the importer's agent, exporter or the exporter's agent, upon the importation or exportation of any fish or wildlife at the place where USFWS clearance is requested. See 50 CFR §§ 14.52, 14.61 and 14.63.

11. Title 18, United States Code, Section 545 makes it unlawful for a person to "fraudulently or knowingly import[] or bring[] into the United States, any merchandise contrary to law, or receive[], conceal[], buy[], sell[], or in any manner facilitate[] the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law."

12. Title 18, United States Code, Section 554 makes it unlawful for a person to "fraudulently or knowingly export or send from the United States, any merchandise, article or object contrary to law or regulation of the United States, or receive[], conceal[], buy[], sell[], or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be

(6)

intended for exportation contrary to any law or regulation of the United States."

13.    The Lacey Act, 16 U.S.C. § 3371, et seq., is a federal law that, among other things, makes it is unlawful for any person to make or submit any false record, account, or label for, or any false identification of, any fish, wildlife, or plant which has been or is intended to be either imported or transported in interstate or foreign commerce.   16 U.S.C. §§ 3372(d), 3373(d).

14.    Title 16, United States Code, Sections 1538(c), 1540(b), provide criminal sanctions for any person who knowingly engages in any trade in any specimens contrary to the provisions of CITES.

## IV. STATEMENT OF PROBABLE CAUSE

15.    On March 3, 2017, the Honorable Suzanne H. Segal, United States Magistrate Judge, issued an anticipatory search warrant based on an affidavit by USFWS Special Agent Stephanie Johnson.   I hereby incorporate the statements in that affidavit, which is attached as Exhibit 1, to support probable cause for the complaint and arrest warrant.   To summarize that affidavit, on March 2, 2017, a United States Customs and Border Protection inspection of a United States Postal Service parcel being imported from Hong Kong revealed three live king cobra snakes --

(7)

a legally-protected and highly venomous/deadly reptile -- each

of which was approximately two-feet long and three albino

Chinese soft-shelled turtles (that same day, a sender using the

same name attempted to export six CITES Appendix II protected

turtles). Attached as Exhibit 2 to this affidavit are

photographs of the cans that cobras were imported in,

photographs of Wildlife Inspector Cory Kawabata opening one of

the cans (revealing one of the snakes), and a photograph of one

of the cobras in a tank at our USFWS office.

16. On March 3, 2017, I helped with the execution of the

anticipatory warrant mentioned above. Specifically, on March 3,

2017, I watched as United States Postal Inspector Carl Nonas-

Truong delivered the parcel, containing Chinese albino soft-

shelled turtles, to the residence (Because the three cobras were

venomous, returning them to the package was itself dangerous,

and there was also danger to the community in delivering live

cobras, so the cobras were seized and not returned to the

package for delivery). After the package was accepted, I

approached the apartment with SA Juan Ramirez Amezcua, SA

Johnson, SA Laura Chee, and SA Erin Dean, as well as multiple

Special Agents from Homeland Security Investigations ("HSI").

17. I assisted with the search of the apartment and found

that the parcel Postal Inspector Carl Nonas-Truong delivered had

been placed at the foot of the bed in what appeared to be a

children's bedroom. In that same bedroom, I also saw a glass tank containing a live baby crocodile, which was later identified by Los Angeles Zoo Reptile Curator Ian Reccio as a Morelet's crocodile (Crocodylus moreletti), and glass tanks containing turtles, which were later identified by USFWS Wildlife Inspector Joseph Ventura as three alligator snapping turtles (Macrochelys temminckii), a common snapping turtle (Chelydra serpentina), and five diamond back terrapins (Malachlemys terrapin), all listed as CITES Appendix II. I also saw glass tanks containing a non-protected musk turtle and various species of fresh water fish.

18. During the execution of the warrant, I saw RODRIGO FRANCO arrive at the apartment. After his arrival, I observed that he was interviewed by SA Johnson, SA Ramirez Amezcua and Postal Inspector Carl Nonas-Truong.

19. After we completed the execution of the warrant, I reviewed the recording of FRANCO's interview and talked to SA Johnson about the interview. From these, I learned that FRANCO told SA Johnson during the interview that he had received two previous shipments of cobras in the mail. FRANCO told SA Johnson that he received about ten king cobras in the first shipment and ten king cobras in the second shipment. FRANCO also told SA Johnson that the cobras in the two prior shipments were dead on arrival, and that he knew from comments he read

online that "venomous were illegal." FRANCO also told SA

Johnson that he had used the name "Carlos Sandoval" and shipped

out the six protected turtles that were intercepted at the mail

facility on March 2, 2017. FRANCO initially denied knowing that

there were originally king cobras in the parcel that special

agents delivered to FRANCO on March 3, 2017, and claimed to have

only known about the three soft-shelled turtles in the parcel.

After being admonished by SA Johnson and Postal Inspector Nonas-

Truong that it was a crime to lie to federal agents, FRANCO

ultimately admitted that he knew the package being shipped to

his residence would contain at least one king cobra.

20. During the execution of the warrant, I collected
Franco's cellular phone ("iPhone") as evidence.

21. SA Johnson informed me of the following:

a. SA Johnson informed that, on March 6, 2017, she

shipped FRANCOS's iPhone to the USFWS Digital Evidence Recovery

and Technical Surveillance Unit ("DERTSU") in Jacksonville,

Florida. DERTSU Senior SA David Johnson informed SA Johnson

that, on March 7, 2017, he received the iPhone and used a

Cellebrite Universal Forensic Extraction Device ("UFED") to

forensically extract the data, to include call history, text

messages, application communications, contacts, photographs and

videos from the cellular phone pursuant to the attached search

9

warrant. The extracted data was then placed in files on a universal serial bus ("USB") flash drive.

b.  On March 9, 2017, SA Johnson received the iPhone back from DERTSU SA David Johnson.

c.  On March 10, 2017, the extracted data was transferred from DERTSU Senior SA David Johnson to DERTSU Senior SA Mark Sletto for forensic analysis, which included organizing the extracted data into electronic files and searching for keywords, such as "cobra," relevant to the import of the king cobras.

d.  On April 21, 2017, SA Johnson received the complete extracted results on a USB flash drive from SA Sletto.

22.  In April of 2017, I had several conversations with SA Johnson as she reviewed the evidence that had been recovered from FRANCO's iPhone. I reviewed a report that SA Johnson prepared documenting conversations and photos that were recovered from FRANCO's cellular phone. Based on conversations I had with SA Johnson and my review of her report, I learned the following:

a.  FRANCO had been in communication with several individuals through the communication application "Whatsapp." Whatsapp is a free instant messaging platform for smartphones, which allows users to make calls, send images, videos and text messages. These profiles were identified with Chinese

10

characters. One such profile was also identified as an individual in English as "Ji Anji."

b. Recovered from the phone was a deleted conversation between FRANCO and Ji Anji where they discussed establishing a business relationship in which FRANCO would purchase reptiles in the United States and then ship them to Anji in Hong Kong. In return, Anji would pay FRANCO with both money, and reptiles, which included live king cobras.

c. During this conversation, FRANCO told Anji that he purchased several different box turtles for him. On February 13, 2017, FRANCO asked Anji when he would be sending the albino Chinese soft-shelled turtles. In response, Anji wrote, "I want to send u Chinese king cobra first because that's our first business…Let's just finish the first deal, because I need to pay 180 dollars shipping fee for a parcel to smuggle to California."

d. Anji sent FRANCO detailed instructions on how to package the turtles in socks, including photos and a video. When FRANCO informed Anji that he was shipping the turtles via FedEx, Anji responded that he thought FedEx was "strict with parcels." FRANCO responded with the following, "FedEx no us [*sic*] postal yes they open the package in front of you" and "FedEx don't open it."

e. FRANCO asked Anji if turtles were illegal to ship to Hong Kong and Anji replied, "Do you remember u send me the

11

(n)

king and corn?"  FRANCO responded, "Yes but sent to China."
Anji replied, "Ahh, just like that time…HK it's very very easy."

> f.   On February 16, 2017, FRANCO sent Anji a message
with the address "1551 ridge crest St Apt G City Monterey Park
State California Zip 91754 Carlos Sandoval" and instructions to
ask for no signature required upon delivery.  Anji replied, "Ok
,ahh, as I send it, do not check the track number…If you want to
check the process ,just message me…Some guys were caught in USA
,because the company can follow their ip…If the parcel was
checked (worst consequence),u can say I don't know and they
can't check your follow recored[sic]."

> g.   On February 20, 2017, FRANCO asked Anji for a
photo of a king cobra and asked if they eat mice.  Anji replied
that they prefer snakes but will eat mice if there is snake
blood on them.

> h.   Between February 20 and February 26, 2017, FRANCO
and Anji negotiated for the purchase and shipment of six more
box turtles by FRANCO.  On February 26, 2017, Anji asked for a
phone number for shipping and instructed FRANCO to not use his
own phone number.

> i.   On March 3, 2017, Anji sent FRANCO a message
complaining about the slowness of the mail.  FRANCO sent Anji a
message and said, "Sorry friend."  Anji replied, "No!!  ...U

12

don't need to say sorry to me...This is the kc and albino soft shell...I should say sorry to u [sic]."

23.   Based on conversations that I had with SA Johnson and my review of her report, I also learned that she had asked FRANCO on March 3, 2017, March 10, 2017, March 31, 2017, and May 16, 2017 about what happened to the previous shipments of king cobras he had received from Hong Kong.  On each occasion, FRANCO told her the king cobras were "they're dead."  I also learned that FRANCO told her he received a shipment of king cobras approximately seven to eight months prior, and although he claimed they were "they're dead," FRANCO said that one of his contacts in China had a cousin that flew to Los Angeles from Virginia, collected the snakes, and returned to Virginia with the dead snakes.

24.   I also learned from SA Johnson's report; documenting conversations recovered from FRANCO's cell phone, that, on September 24, 2016, FRANCO had a conversation with an individual named "Liang" who said "My cousin will be there today."  FRANCO responded by saying "3 snakes didn't want to eat so they died today...only 5 still alive now...you can have my snake so your cousin can take all 5 snakes and I'll have my snakes next time ok."  Based on this evidence, I believe that Franco was untruthful when he told SA Johnson that the previous cobras that he had received had all died.

13

## V.   CONCLUSION

25.   For all the reasons described above, there is probable cause to believe that FRANCO committed a violation of Title 18, United States Code, Section 545 (importing merchandise into the United States contrary to law).


                                                _____

ADAM DIEHL, Special Agent,
USFWS

Subscribed to and sworn before me

this 21st day of July, 2017.



_____

HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

14

# Exhibit 1

(16)

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| **UNITED STATES OF AMERICA**<br>v. | DOCKET NO.  *17MJ00462*  MAGISTRATE'S CASE NO. |
| **THE PREMISES KNOWN AS:**<br>Location in which visual surveillance indicates the United States Postal Service package with tracking Number EA259339179HK has been accepted for delivery located at 1551 Ridge Crest Street, Apartment G, Monterey Park, California 91754 | **TO:**<br>ANY SPECIAL AGENT(S) WITH THE UNITED STATES FISH AND WILDLIFE SERVICE OR ANY OTHER AUTHORIZED OFFICER |

Affidavit having been made before me by the below-named affiant that he/she has reason to believe that on the premises known as

SEE ATTACHMENT A

in the Central District of California

there will be concealed certain property, namely:

SEE ATTACHMENT B

and as I am satisfied that there is probable cause to believe that <u>upon the occurrence of the triggering event described in Section VII of the search warrant affidavit</u>, the property so described will be concealed on the person or premises above-described and the grounds for application for issuance of the search warrant exist as stated in the supporting affidavit which is incorporated herein by reference and attached hereto.

**YOU ARE HEREBY COMMANDED** to search on or before _____ fourteen (14) days _____ (not to exceed 14 days) the person or place named above for the property specified, serving this warrant and making the search at any time in the day or night <u>upon the occurrence of the event described above</u>, and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant to <u>the duty U.S. Magistrate Judge</u> as required by law.

| NAME OF AFFIANT | SIGNATURE U.S. MAGISTRATE JUDGE** | DATE/TIME ISSUED |
|---|---|---|
| **Stephanie Johnson, United States Fish and Wildlife Service** | *Suzanne H. Segal*<br>**The Honorable Suzanne H. Segal** | 3/3/17  11:00am |

AUSA: Erik M. Silber

(17)

## ATTACHMENT A

<u>PREMISES TO BE SEARCHED</u>

The SUBJECT PREMISES to be searched -- only after the event that triggers the anticipatory search warrant, <u>i.e.</u> delivery and acceptance of the United States Postal Service package bearing Tracking Number EA259339179HK and addressed to Carlos Sandoval -- is located at 1551 Ridge Crest Street, Apartment G, Monterey Park, California 91754.  It is within the Ridgewood Apartments Complex.  The apartment is located on the second floor of a brown building with wooden siding in the middle of the complex. The building is identified with the number 1551.

i

[Non-Instrumentality Protocol]



### ATTACHMENT B

ITEMS TO BE SEIZED

    1.  The items to be seized from 1551 Ridge Crest St. Apt G, Monterey Park, California, 92843 (the "SUBJECT PREMISES") constitute evidence, fruits, and/or instrumentalities of violations of 16 U.S.C. §§ 1538(c), 1540(b), 50 C.F.R. §§ 23.13, 23.20 (illegally importing legally-protected animals); 16 U.S.C. §§ 3372(d), 3373(d)(3)(A)(i) (submitting a false record or label for wildlife intended to be imported); and 18 U.S.C. § 545 (smuggling goods into the United States), namely:

    a.  A United States Postal Service package with Tracking number EA 259339179HK and addressed to Carlos Sandoval at 1551 Ridge Crest St, Apt G, Monterey Park, California 91754, and its contents, including live Convention on the International Trade in Endangered Species of Wild Fauna and Flora ("CITES") protected wildlife.

    b.  Any other CITES-protected wildlife.

    c.  Records relating to the purchase, importation, transportation, storage, possession, transfer, disposition, trade, sale, offer to purchase, or offer for sale of CITES-protected wildlife, including notes, memos, notebooks, books, correspondence regarding CITES-protected wildlife, invoices, shipping records, packing slips, facsimiles, purchase orders, bills of sale, shipping records, letters of credit, permits, customs forms, contracts, importation documents, receipts, customer lists, price lists, financial records, cancelled checks, check book ledgers, money orders, wire transfers, bank

ii

statements, international bank transfer statements, cashier checks, cash, credit card statements, personal telephone directories, and photographs; and

d. Records and documents reflecting communications with government agencies, consumer associations, and business associations about CITES-protected wildlife, or the requirements for the importation or exportation of wildlife under CITES, including documents or licenses regarding compliance or non-compliance with governmental rules and regulations, or declarations, permits, and licenses required by governmental rules and regulations to import, export, or transport wildlife products.

e. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

iii

[Non-Instrumentality Protocol]



as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v. evidence of the times the device was used;

        vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii. records of or information about Internet Protocol addresses used by the device;

        ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created,

iv

[Non-Instrumentality Protocol]

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in

v

[Non-Instrumentality Protocol]



their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

vi

[Non-Instrumentality Protocol]

23

Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the

[Non-Instrumentality Protocol]

time for searching the device has expired) absent further court
order.

g.    The government may retain a digital device itself
until further order of the Court or one year after the
conclusion of the criminal investigation or case (whichever is
latest), only if the government, within 14 days following the
time period authorized by the Court for completing the search,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending).
Otherwise, the government must return the device.

h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

5.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

a.    Any digital device capable of being used to
commit, further or store evidence of the offense(s) listed
above;

b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

      c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

      d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

      e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

ix

[Non-Instrumentality Protocol]